1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10
11  NICKOLAS LEONARDOS,                          No. C 06-07769 JSW
12         Petitioner,
13    v.
14  LOREN BUDDRESS, in his capacity as Chief      **ORDER DENYING PETITION FOR A**
    Probation Officer of the SAN MATEO            **WRIT OF HABEAS CORPUS**
15  COUNTY PROBATION DEPARTMENT,
16         Respondent.
                                         /
17

18                              **INTRODUCTION**

19         Now before the Court is Nickolas Leonardos' petition for writ of habeas corpus pursuant to

20  28 U.S.C. § 2254, concerning his November 2003 conviction.  After considering the administrative

21  record, the parties' papers and arguments, and reviewing the relevant legal authority, the Court

22  hereby DENIES the petition for writ of habeas corpus.

23                              **BACKGROUND**

24  A.     **Factual Background.**

25         A jury convicted Nickolas Leonardos ("Leonardos") of annoying or molesting a minor and

26  child endangerment, in violation of California Penal Code §§ 637.6(a) and 273a(b), respectively.

27  The California Court of Appeal subsequently affirmed the annoying or molesting conviction, and

28  overturned the child endangerment conviction.  The facts underlying the conviction at issue as found

United States District Court
For the Northern District of California

by the California Court of Appeal, First Appellate District, are summarized below as follows:

Appellant was a teacher at Alta Loma Middle School in South San Francisco. Appellant's classroom was open to students both before and after school.  During those times, students could come to him for homework help or to talk about life. Students at the school felt comfortable talking to him about their personal problems.

Brittany, who was born in January 1989, attended Alta Loma for three years. When she was in seventh and eighth grade, Brittany was in appellant's yearbook class. Brittany also participated in appellant's ecology club which did recycling around campus.

In addition, Brittany babysat for appellant's two five-year-old children. Brittany frequently babysat for appellant during the summer between her seventh and eighth grade.  Appellant, who drove Brittany to and from his home, paid Brittany $10 per hour.  While at appellant's home, Brittany played with the children, vacuumed and played pool.  On one occasion late in the summer, Brittany saw a Smirnoff Ice alcoholic beverage in appellant's refrigerator and asked if she could drink it. Appellant said she could have that drink whenever she wanted.  Brittany estimated that she drank Smirnoff beverages 10 times while at appellant's home during 2002. On occasion, when appellant drove Brittany home, he gave her gum to mask the smell of alcohol on her breath.

One day while she was at appellant's house, Brittany thought she smelled marijuana and asked if appellant had been smoking it.  According to Brittany, appellant replied, "you'll never catch me smoking it."  Although initially refusing her requests, appellant eventually agreed to smoke marijuana with Brittany and told her she really had to care about him and trust him because he could get into lots of trouble for letting her smoke.  Brittany estimated that she and appellant smoked marijuana together between four and 10 times.

On one occasion, when appellant and Brittany were playing pool together, appellant asked if Brittany had ever played "strip pool."  Another time, appellant turned the television on to the Playboy Channel while he and Brittany were playing pool together.  A naked woman was reporting the weather.

During the fall of her eighth grade year, Brittany spent a great deal of time in appellant's classroom before school, during lunch and after school.  While in the classroom during these times, appellant and Brittany often engaged in crude banter. They made comments like "lick my clit," and "suck my dick."

On November 22, 2002, Brittany told her mother she was going to do some recycling with appellant. Instead, they went to appellant's home to "hang out." Brittany and appellant played pool, drank Smirnoff Ice, and smoked marijuana. Before appellant's wife and children arrived home, they went to the beach, watched the sunset and went for a drive.  According to Brittany, appellant asked, "you want to jump my bones as much as I want to jump yours?"  Brittany laughed.  Before he dropped Brittany off at a racquetball club where she was supposed to meet her mother, appellant said "I can't believe I'm about to have an affair with a 13-year-

old." Brittany laughed.  As she got out of the car, Brittany kissed appellant on the check.  Appellant pointed to a wet spot on his pants and said, "look what you made me do."

The next evening, November 23, 2002, Brittany told her mother she was going to the movies with a friend named Cheryl.  Instead, she called appellant and arranged to meet him at a nearby park.  The two drove around, talked and smoked marijuana. At some point Brittany pretended to be asleep because she suspected appellant was attracted to her and wanted to see what he would do.  Brittany later recalled that appellant said "I got to be good; I have a wife and kids; I just got to be good."  At some point, appellant stopped the car, tried to wake Brittany and asked "can I touch you?"  He tickled her and touched her upper chest area.  Then appellant called his wife who told him that Brittany's mother was trying to locate her.  Appellant took Brittany back to the park and told her to tell her mother that she had come home early because she and Cheryl had a fight at the movies.  When Brittany arrived at home, her mother called the police.

Two police officers interviewed appellant on the evening of November 23, 2002.[1]  Appellant told police Brittany called him at around 5:30 that afternoon.  She was despondent or upset about something and asked if he wanted to talk.  Appellant agreed and arranged to pick her up at a park near her house.  They talked about life in general, her homework and about her mother who was "on her case."  Appellant said he dropped Brittany off about 45 or 50 minutes later at the park where he had picked her up.

Appellant told the police he had recently been in a serious cycling accident and broke several bones and needed help around his house.  Brittany had been babysitting once or twice a week since September. Appellant said he also spent time with Brittany before school and at lunch when students were free to come to his classroom to talk about life.

An officer told appellant that Brittany said she and appellant had a "relationship."  Appellant responded their relationship was between teacher and student but then acknowledged that Brittany may have been infatuated with him.  He acknowledged that he acted like a friend to kids and that he let kids, including Brittany "talk trash to him," and make comments like "suck my dick," and "screw you."  The officers suggested that Brittany thought she was appellant's girlfriend because Brittany had kissed appellant, put her arm around him and that there had been touching.  Appellant responded that he let kids jump on his back so there was physical contact but "not like groping or something like that."  Appellant acknowledged that Brittany may have misconstrued things and said the officer had taught him a lesson.

Appellant became nervous and upset during the interview.  He recognized, in hindsight, that "I'm too personable and I talk to the kids when they ask me for

---

[1]   The interview was videotaped without appellant's knowledge.  The videotape was introduced into evidence at appellant's trial.

advice." He said he was wrong to have a personal conversation with Brittany at night for 45 minutes when he knew her mother wanted her to be accountable for her time.

Appellant agreed to give a semen and saliva sample. When asked if he would also give a handprint sample, appellant explained that he had touched Brittany when he helped her out of his car because she had fallen asleep in the back seat. He said that his handprints could be on her shoulder, chest and stomach area. Appellant also said that Brittany may have kissed him on the cheek. Appellant said he wanted to apologize to Brittany's mother. The officer suggested he write her a letter because she was too upset to talk.

During a break from the police interview, appellant wrote a letter to Brittany's mother. He apologized for not asking permission before talking with her daughter about life, and for picking her up at the park and for the fact that she did not know where her daughter was. Appellant also apologized if Brittany was misled in any way and if she thought their relationship was anything other than friends and student-teacher. Near the end of the letter, appellant said: "Brittany I am sorry that if [sic] I misle[d] you but I was here as a friend. I should have been a teacher and we should only talk in supervised school setting."

A different officer interviewed appellant on November 25, 2002.[2] Appellant said that he and Brittany had a good student-teacher relationship. They also had common interests including basketball and teachers they both disliked. He realized in retrospect that Brittany had a crush on him. His relationship with Brittany was stronger than his relationship with other students because she babysat for him, he trusted her with his kids, and she was very charismatic. Appellant also said that he was like a big brother or father figure for Brittany whose mother beat her and who needed someone to talk to.

The officer told appellant that Brittany had given a detailed account of her car ride with appellant on the previous Saturday evening. When told that Brittany reported that appellant touched her breasts, appellant responded that he probably had when he grabbed her to get her out of the car and that "I shouldn't have." The officer said Brittany reported that appellant asked if he could touch her. Appellant explained: "I said to her I have got to touch you to get you out of the car."

Appellant also admitted that, during the car ride, he said "I have to be good, I have to be good." Appellant explained that he made that statement because it was starting to dawn on him that Brittany liked him. Appellant also knew from prior conversations that Brittany had been molested by another teacher. In light of these facts, appellant realized and was telling Brittany that they were going to have to stop playing a game that she liked to play with him. The game involved hitting each other's arm either as hard or as soft as they could.

Appellant acknowledged that he and Brittany had a serious discussion the day

---

[2]     This interview was also videotaped without appellant's knowledge and a copy of the tape was introduced into evidence at trial.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

before the Saturday evening car ride.  While the two were working on a recycling project together, they talked about the fact that Brittany had an attraction for appellant.  Appellant recalled telling Brittany she was "an attractive young lady, but it can't go on" and that "[w]e have to be good."  Appellant explained that even though Brittany said she liked him, he did not really understand that there was an infatuation until after his first police interview.

Appellant acknowledged that Brittany is a very attractive girl and that she looks older than her 14 years; he also admitted that they spent time together, had common interests, and that "we click."  Appellant characterized his discussion with Brittany about their mutual attraction as inappropriate because he had a "cavalier attitude toward it" and he "joked too much."  He was leading her on, letting her think he was attracted to her.  Later in the interview, appellant admitted that he was attracted by Brittany's charismatic personality which he likened to O.J. Simpson and characterized as very likeable.  Appellant also conceded that, if he was Brittany's age, he would have "no problem" accepting an invitation to have sex with her.

At one point during this second interview, the following exchange occurred:

"[Officer]: But as you build this relationship and this attraction how hard do you think it would be to resist her if she wanted to move a little farther?

"[Appellant]: If she came on to me?

"[Officer]: Exactly.  How hard do you think that would be Nick?

"[Appellant]: Honestly?

"[Officer]: Yes honestly.

"[Appellant]: I'm glad the police called up."

Appellant admitted that he had said inappropriate things to Brittany, that she called him honey and he called her darling and that when she made sexual, he made them right back to her.  When asked for an example of inappropriate sexual remarks that the two made, appellant said Brittany would say "lick my clit" and he would respond "you got the time, I got the place."  Appellant told the officer that, as he looked back on things that had happened, he realized and acknowledged that this type of behavior was inappropriate and wrong.

(*People v. Leonardos*, No. A106914, (Cal. Ct. App. June 29, 2005), Respondent's Ex. B-3.)  At trial, Brittany gave testimony in which she discussed the sexual banter that she engaged in with Leonardos.  Danielle Haney, one of Brittany's friends from Alta Loma Middle School, also testified that Brittany and Leonardos made sexual comments to each other.  (Respondent's Ex. A-4 at 121:12-123:8.)

**United States District Court**
For the Northern District of California

**B.      Procedural History.**

On May 2, 2003, the San Mateo District Attorney charged Leonardos with committing a lewd or lascivious act upon a child under the age of 14 in violation of California Penal Code § 288(a), and with annoying or molesting a child under the age of 18 in violation of California Penal Code      § 657.6(a).  (Respondent's Ex. A-1 at 2:24-3:14.)  The District Attorney filed a second case against Leonardos on September 2, 2003, charging Leonardos with five counts of providing marijuana to a child under the age of 14 in violation of Health & Safety Code § 11361(a), one count of contributing to the delinquency of a minor in violation of California Penal Code § 272(a)(1), and one count of child endangerment in violation of California Penal Code § 273a(b).  (Respondent's Ex. A-2 at 383-85.)  These cases were consolidated and Leonardos was tried before a jury in the San Mateo County Superior Court, with Judge Scott presiding.  (*Id.* at 319-321, 383-85.)  On November 5, 2003, the jury found Leonardos guilty of one count of molesting a child under the age of 18 (Cal. Penal Code § 657.6(a)), and one count of child endangerment (Cal. Penal Code § 273a(b)).  (Respondent's Ex. A-2 at 395.)  The jury did not reach a verdict as to the other charges.  (*Id.*)

On March 3, 2004, Leonardos filed a motion seeking a new trial.  (*Id.* at 325.)  Judge Scott denied the motion on April 19, 2004.  (*Id.* at 370.)  On April 30, 2004, Leonardos appealed his conviction to the California Court of Appeal.  (*Id.* at 375.)  The California Court of Appeal reversed Leonardos' conviction for child endangerment based on insufficiency of the prosecution's evidence, but upheld his conviction for annoying or molesting a child under the age of 18.  (Respondent's Ex. B-3 at 1.)  On December 18, 2006, Leonardos appealed the First Appellate District's decision to the Supreme Court of California.  (Respondent's Ex. D-1 at 18.)   The Court denied this motion without opinion on September 21, 2005.  (Respondent's Ex. C-2 at 1.)

On December 19, 2006, Leonardos filed with this Court an application to hold his federal habeas petition in abeyance pending exhaustion of potentially dispositive issues in state court.  (Petitioner's Dec. 19, 2006 Mot. at 1.)  On April 19, 2007, this Court granted Leonardos' motion.  (April 17, 2007 Order at 6.)  Having exhausted his claims in the California courts, Leonardos filed an amended petition for writ of habeas corpus with this Court on September 26, 2007.  On July 28, 2009, this Court found that Leonardos' claims appeared potentially colorable, and therefore ordered

1   Respondent to show cause as to why Leonardos' writ should not be granted.  (July 28, 2009 Order at

2   2.)

3   **JURISDICTION AND VENUE**

4   Because Leonardos has claimed violations of the Constitution of the United States and has

5   exhausted all remedies available to him in state court, this court has subject matter jurisdiction over

6   his habeas petition for relief under 28 U.S.C. § 2254.  Pursuant to 28 U.S.C. § 2254(d), Leonardos

7   has met the requirement to file his petition within one year and 90 days of the finality of his state

8   court proceedings.  *See* 28 U.S.C. § 2254(d); *Bowen v. Roe*, 188 F.3d 1157, 1158 (9th Cir. 1999).

9   Moreover, this action is in the proper venue because the challenged conviction occurred in San

10   Mateo County, California, which is located within this judicial district.  *See* 28 U.S.C. § 2241(d).

11   **STANDARD OF REVIEW**

12   The Court may entertain a petition for a writ of habeas corpus "in behalf of a person in

13   custody pursuant to the judgment of a state court only on the ground that he is in custody in violation

14   of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *see also Rose v.*

15   *Hodges*, 423 U.S. 19, 21 (1971).  Because the petition was filed after the effective date of the

16   Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEPDA's provisions apply.

17   *Jeffries v. Wood*, 103 F.3d 827 (9th Cir. 1996) (en banc).

18   Under AEPDA, this Court may grant the petition with respect to any claim that was

19   adjudicated on the merits in state court only if the state court's adjudication of the claim: "(1)

20   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

21   established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in

22   a decision that was based on an unreasonable determination of the facts in light of the evidence

23   presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Williams (Terry) v. Taylor*,

24   529 U.S. 362, 413 (2000) (hereinafter "*Williams*").  Courts are not required to address the merits of a

25   particular claim, but may simply deny a habeas application on the ground that relief is precluded by

26   28 U.S.C. § 2254(d).  *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003).  It is the habeas petitioner's

27   burden to show he is not precluded from obtaining relief by section 2254(d).  *See Woodford v.*

28   *Visciotti*, 537 U.S. 19, 25 (2002).

**United States District Court**
For the Northern District of California

7

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412; *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005) ("clearly established" federal law determined as of the time of the state court's last reasoned decision); *Alvarado v. Hill*, 252 F.3d 1066, 1068-69 (9th Cir. 2001). "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. The Supreme Court has held repeatedly that AEDPA, which embodies deep-seated principles of comity, finality, and federalism, establishes a highly deferential standard for reviewing state-court determinations. *See id.* at 436. Thus, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

12
13
14
15
16
17
18
19

Under the "contrary to" clause of section 2254(d)(1), a federal court may grant the writ only if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that are materially indistinguishable from a decision' of the Supreme Court and nevertheless arrives at a different result." *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams*, 529 U.S. at 405-06). Under the "unreasonable application" clause of section 2254(d)(1), a federal court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413.

20
21
22
23
24
25
26
27
28

A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 412. The objectively unreasonable standard is not a clear error standard. *Lockyer*, 538 U.S. at 75-76; *Clark v. Murphy*, 331 F.3d 1062, 1067-69 (9th Cir. 2003), *cert. denied*, 540 U.S. 968 (2003). After *Lockyer*, "[t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise. While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." *Clark*, 331 F.3d at 1068.

8

United States District Court
For the Northern District of California

In determining whether the state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the highest state court has summarily denied a petitioner's claim, the habeas court may "look through" that decision to the last state court addressing the claim in a reasoned decision. *See Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

The standard of review under AEDPA is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and where there is no reasoned lower court decision on the claim. In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. *See Hines v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Greene v. Lambert*, 288 F.3d 1081, 1088 (9th Cir. 2002). Therefore, while a state court decision on the merits concerning a question of law normally should be afforded respect, "[i]f there is no such decision on the merits ... there is nothing to which to defer." *Greene*, 288 F.3d at 1089.

**ANALYSIS**

In his petition, Leonardos raises three claims of constitutional error. First, Leonardos asserts that the prosecution suppressed material evidence regarding the civil and criminal history of Brittany's mother, Sandra Maxwell ("Ms. Maxwell"), in contravention of *Brady v. Maryland*, 373 U.S. 83 (1963). Second, Leonardos argues that newly discovered evidence proves that he is actually innocent. He argues, therefore, that the writ should be granted because the Constitution bans punishment of an innocent person. Third, Leonardos argues that the trial court gave the jury an erroneous instruction that allowed the jury to convict him of annoying or molesting a minor under the age of 18 based on acts that did not satisfy the elements of that charge. This instruction, he argues, violated his right to due process.

In response, the Government argues that: (1) the suppression of Ms. Maxwell's history was not a *Brady* violation because her testimony was not material; (2) actual innocence is not a cognizable argument to raise in a habeas petition; and (3) the challenged jury instruction was

unambiguous.

**A.      The Prosecution Did Not Suppress Material Evidence in Violation of *Brady v. Maryland*.**

Leonardos argues that the prosecution violated his right to due process by failing to "disclose all material evidence favorable to an accused, including evidence relating to the credibility of a material witness." (Petitioner's Memo. of P & A at 20.)  Specifically, Leonardos emphasizes that Ms. Maxwell was convicted of welfare fraud and ordered to reimburse the government for the funds that she fraudulently pilfered.  Leonardos argues that in its failure to disclose this information, the prosecution prevented him from: (1) impeaching Ms. Maxwell's character for veracity; and (2) establishing that both Ms. Maxwell and Brittany had a financial motive to manufacture false allegations against him.

**1.      Legal Standard for Suppression of Evidence.**

In *Brady v. Maryland*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or the bad faith of the prosecution."  373 U.S. at 87.  Although *Brady* refers to information "upon request" of the accused, the Supreme Court has held that "if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made." *United States v. Agurs*, 427 U.S. 97, 107 (1976); *accord Singh v. Prunty*, 142 F.3d 1157, 1161 (9th Cir. 1998) ("The requirements of due process obligate a prosecutor to disclose material exculpatory evidence on its own motion and without request.").  The Court has also held that "[i]mpeachment evidence ... falls within the *Brady* rule," because "if [it is] disclosed and used effectively, it may make the difference between conviction and acquittal," and therefore it is "favorable" to the accused. *United States v. Bagley*, 473 U.S. 667, 676 (1985).  These interpretations of *Brady*'s scope are set against the background principle that "the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." *Agurs*, 427 U.S. at 108.

The Supreme Court has examined extensively the "material" disclosure requirement of *Brady*.  In *Bagley*, the Court held that undisclosed evidence is "material" within the meaning of

**United States District Court**
For the Northern District of California

10

United States District Court
For the Northern District of California

*Brady* "only if there is a reasonable probability that, had the evidence been disclosed by the defense, the result of the proceeding would have been different." 473 U.S. at 682. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.*; *accord Strickland v. Washington*, 466 U.S. 668, 694 (1984). The suppression of evidence may "undermine confidence" in the outcome even without "demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal ...." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (citing *Bagley*, 473 U.S. at 682). Moreover, a defendant does not need to demonstrate that there would not have been enough evidence to convict had the suppressed evidence been disclosed. *Id.* at 434-35.

*Brady* applies to impeachment information that affects the credibility of important government witnesses. *Bagley*, 473 U.S. at 676 ("This Court has rejected any ... distinction between impeachment evidence and exculpatory evidence."); *accord Killian v. Poole*, 282 F.3d 1204, 1210 (9th Cir. 2002). "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within th[e *Brady*] rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). In the Ninth Circuit, impeachment information implicates *Brady* only when that information relates to a key witness. In *Singh*, for example, the Ninth Circuit explained that a witness' testimony is sufficiently material when "[i]t is likely the jury *had* to believe [the witness'] testimony in order to believe the prosecution's theory." 142 F.3d at 1161 (emphasis added). Likewise, the Ninth Circuit found a *Brady* violation where the prosecution knowingly allowed the "'make-or-break witness' for the state" to offer perjured testimony. *Killian*, 282 F.3d at 1209. In short, "*Brady* information includes 'material ... that bears on the credibility of a *significant* witness in the case.'" *United States v. Brumel-Alvarez*, 991 F.2d 1452, 1461 (9th Cir. 1993) (quoting *United States v. Strifler*, 851 F.2d 1197, 1201 (9th Cir. 1988), *cert. denied*, 489 U.S. 1032 (1989)) (omission original, emphasis added). Therefore, *Brady* applies to impeachment evidence only if that evidence pertains to a witness whose testimony is "make-or-break" or otherwise "significant."

**United States District Court**
For the Northern District of California

2.      **The Prosecution's Failure to Disclose Ms. Maxwell's Civil and Criminal History Did Not Violate Leonardos' Right to Due Process.**

In Leonardos' trial, Ms. Maxwell was not a material witness, and therefore the prosecution's failure to disclose her prior misdemeanor fraud conviction did not amount to a *Brady* violation.  In *Giglio*, the "Government's case depended almost entirely on [the witness'] testimony; without it there could have been no indictment and no evidence to carry the case to the jury." *Giglio*, 405 U.S. at 150.  Here, on the other hand, there would have been ample evidence to convict Leonardos even if Ms. Maxwell had not testified.  *Cf. Willhoite v. Vasquez*, 921 F.2d 247, 249 (9th Cir. 1990) (government did not violate *Brady* by suppressing its plea agreement with witness because, "unlike in *Giglio*," the prosecution had "evidence independent of [the witness'] testimony that connected the petitioners to the murder.").

Most strikingly, Leonardos admitted to acts that alone could have supported the guilty verdict as to the annoying or molesting a minor charge.  Leonardos "admitted [to the police] that he had said inappropriate things to Brittany ... and that when she made sexual remarks to him he made them right back to her."  (Respondent's Ex. B-3 at 6-7.)  Leonardos also told the police that he "probably" touched Brittany's breasts when he attempted to awaken her, and acknowledged that he "probably shouldn't have" done that.  (Respondent's Ex. A-1 at 156:4-5.)  Furthermore, when Leonardos described his relationship with Brittany to an investigating police officer, he recognized that he "was doing something stupid this whole time."  (*Id.* at 177:5-6.)  When the officer asked Leonardos to describe sexual remarks Brittany had made to him, he replied "oh she'll say ... lick my clit."  (*Id.* at 182:3-4.)  When she said this to him, he would say "you got the time, I got the place."  (*Id.* at 182:7-13.)  Therefore, Leonardos admitted to behaving in a completely inappropriate fashion towards Brittany.  Because these admissions were sufficient for the jury to convict Leonardos of the charge, the testimony of Brittany's mother was not material.  Leonardos' admissions distinguish this case from *Singh* and *Giglio*, in which the government's witnesses were material as the only support for the prosecution's argument.  *See, e.g.*, *Giglio*, 405 U.S. at 154; *see also Singh*, 142 F.3d at 1161.  Here, the jury did not have to believe any of the government's witnesses in order to convict.  Rather, the jury could have convicted Leonardos based solely on his own admissions.  Moreover, the prosecution explained to the jury that Leonardos' testimony formed the chief support for its

**United States District Court**
For the Northern District of California

1  allegations: "This is not a difficult case ... because[] even if you have a tough time believing Brittany

2  about some of the stuff she told you, it is the Defendant's own words that sink him."  (Respondent's

3  Ex. A-6 at 279:20-24.)  This corroborating evidence establishes that the allegedly suppressed

4  evidence did not pertain to the prosecution's "material" witnesses.  Because their testimony was not

5  essential to the government's case, neither Ms. Maxwell nor Brittany were material government

6  witnesses in this trial within the meaning of *Brady*.

7          Furthermore, the prosecution called Danielle Haney, a friend of Brittany, who testified that

8  on several occasions she witnessed Leonardos making crude sexual comments to Brittany.

9  (Respondent's Ex. A-4 at 121:12-123:8.)  Leonardos does not allege that Danielle shared the

10  financial motive of Ms. Maxwell and Brittany.  Even though she did not have a financial motive, her

11  testimony was consistent with Brittany's testimony.  (*Compare id.* at 121:18 (Danielle stating that

12  "[Brittany] would say to [Leonardos] or he would say to her 'lick my clit.'"), *with id.* at 68:6-11

13  (Brittany stating that "lick my clit" was something that she and Mr. Leonardos "always said").)

14  Therefore, Brittany's allegations were in large part corroborated by another witness, and also by

15  Leonardos himself.

16          The subject matter of Ms. Maxwell's testimony also establishes that she was not a

17  "material" witness under *Brady*.  Notably, Ms. Maxwell's testimony did not address what Leonardos

18  did to Brittany.  Rather, Ms. Maxwell testified about the history of Brittany's interactions with

19  Leonardos, both in school and as his babysitter.  Ms. Maxwell also explained the circumstances that

20  led her to become upset with Leonardos on or around November 22, 2002, at which time she forbade

21  Brittany from babysitting for him.  (*See id.* at 148:8-150:24.)  Additionally, Ms. Maxwell described

22  what occurred on November 23, 2002, that aroused her suspicions and led her to call the police.  Ms.

23  Maxwell explained that she "told [the police] I didn't know anything had happened."  (*Id.* at 160:10-

24  16.)  As demonstrated by this statement, Ms. Maxwell did not testify as to what, if anything, Mr.

25  Leonardos had done to annoy or molest Brittany.  Because her testimony did not address the alleged

26  conduct that gave rise to the charge, Ms. Maxwell's testimony could not have "'well be[en]

27  determinative of guilt or innocence.'"  *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 269).

28  The annoying or molesting charge concerned Mr. Leonardos' wrongful behavior towards Brittany,

and the jury simply did not need to believe Ms. Maxwell's testimony in order to convict Leonardos of annoying or molesting Brittany.

Leonardos emphasizes that the prosecution violated *Brady* by failing to disclose that Ms. Maxwell had met with a civil attorney, and that this information would have enabled Leonardos to impeach Ms. Maxwell regarding her financial motive. This argument is meritless for two reasons. First, as discussed above, Ms. Maxwell was not a material witness. Second, Ms. Maxwell's testimony conceded that she had considered suing Leonardos. Leonardos alleges that Ms. Maxwell "claimed ... that she had not retained or spoken to [an attorney] with the intent on suing anyone." (Petitioner's Memo. of P & A at 22:5-7.) However, Ms. Maxwell did acknowledge during her testimony that she had considered suing Leonardos. (Respondent's Ex. A-5 at 179:5-8.) Therefore, even assuming that Ms. Maxwell was a material witness, her testimony gave notice to Leonardos that she had a possible financial motive.

In light of the additional evidence against Leonardos, the subject matter of Ms. Maxwell's testimony, and the fact that Ms. Maxwell stated in court that she might consider suing Leonardos, it cannot be said that "the favorable evidence could reasonably be taken to put the case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Therefore, the Court concludes that prosecution did not violate *Brady* and denies the petition on this ground.

**D.      Leonardos Failed to Prove That He is "Actually Innocent."**

**1.      Legal Standard Regarding Claims of Actual Innocence.**

Whether actual innocence is a viable argument to raise in a habeas petition is a question that the United States Supreme Court has "struggled with ... over the years, in some cases assuming, *arguendo*, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet." *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 129 S. Ct. 2308, 2321 (2009). In *Herrera v. Collins*, 506 U.S. 390, 416 (1993), the Supreme Court "assume[d], for the sake of argument ... that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief." *Id.* at 417; *accord id.* at 419 (O'Connor, J., concurring) ("I cannot disagree with the fundamental legal principle that executing the innocent is

United States District Court
For the Northern District of California

inconsistent with the Constitution."). In *House v. Bell*, the Supreme Court "decline[d] to resolve" whether actual innocence claims may be raised in habeas petitions. 547 U.S. 518, 554-55 (2006). Rather than address the issue directly, the Court held that "much as in *Herrera*, ... whatever burden a hypothetical freestanding innocence claim would require, this petitioner has not satisfied it." *Id.* at 555. In *Osborne*, the Court again faced a habeas petitioner who alleged that he was actually innocent. 129 S. Ct. at 2321-22. The Supreme Court noted that the status of actual innocence in habeas context was an "open question" and "assume[d] without deciding that such a claim exists, because even if so there is no due process problem." *Id.*[3] After *Herrera*, *House*, and *Osborne*, therefore, the Supreme Court has yet to determine the viability of actual innocence-based habeas petitions.

Under the Ninth Circuit's interpretation of *Herrera*, a petitioner may raise claims of actual innocence in a habeas petition. *See Carriger v. Stewart*, 132 F.3d 463, 476-77 (9th Cir. 1997) (en banc), *cert. denied*, 523 U.S. 1133 (1998). In reaching that interpretation, the court noted that "a majority of the Supreme Court assumed, without deciding, that execution of an innocent person would violate the Constitution[, and a] different majority of the Justices would have explicitly so held." *Id.* at 476. In a later opinion, the Ninth Circuit clarified its interpretation of *Herrera* when it held that "a majority of the Justices in *Herrera* would have supported a claim of free-standing actual innocence." *Jackson v. Calderon*, 211 F.3d 1148, 1165 (9th Cir. 2000).

To assert an "actual innocence" claim, a petitioner must meet an "extraordinarily high" burden that, at the minimum, requires him to "go beyond demonstrating doubt about his guilt, and ... affirmatively prove that he is probably innocent." *Carriger*, 132 F.3d at 476 (citing *Herrera*, 506 U.S. at 442-44 (Blackmun, J., dissenting)). Therefore, the burden of proof for actual innocence "contemplates a stronger showing than insufficiency of the evidence to convict." *Id.* (denying petitioner's actual innocence claim because his argument "served only to undercut the evidence presented at trial, not affirmatively to prove [his] innocence" and listing DNA evidence and alibi evidence as examples of proof that might be sufficient ). In other words, the totality of the new

---

[3] Significantly, *Osborne* was the first time the Court assumed that the actual innocence doctrine applied to non-capital cases. *Id.* at 2314 (noting that "the trial judge sentenced Osborne to 26 years in prison, with 5 suspended").

United States District Court
For the Northern District of California

evidence must "undermine the structure of the prosecution's case." *Spivey v. Rocha*, 194 F.3d 971, 979 (9th Cir. 1999).

### 2. Analysis.

#### a. Leonardos Has Not Demonstrated a Violation of Clearly Established Supreme Court Precedent.

Habeas petitioners who seek relief in the federal courts must demonstrate that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Kane v. Garcia Espitia*, 546 U.S. 9, 10 (2006). "Where the Supreme Court has not addressed an issue in its holding, a state court adjudication of the issue not addressed by the Supreme Court cannot be contrary to, or an unreasonable application of, clearly established federal law." *Stenson v. Lambert*, 504 F.3d 873, 881 (9th Cir. 2007) (citing *Kane*, 546 U.S. at 9). Therefore, the existence of "Supreme Court precedent that controls a legal issue raised by a petitioner in state court" is a prerequisite to a successful habeas petition. *Stevenson v. Lewis*, 384 F.3d 1069, 1071 (9th Cir. 2004), *cert. denied*, 543 U.S. 1191 (2005).

There is no "clearly established" Supreme Court precedent regarding whether federal courts can overturn state court convictions based on a "freestanding" claim of actual innocence raised in a habeas petition. In fact, the Supreme Court found in its most recent decision regarding actual innocence claims raised through habeas petitions that "[w]hether such a federal right exists is an open question." *Osborne*, 129 S. Ct. at 2321. The Court declined to answer this "open question," and instead "assume[d] *without deciding* that such a claim exists." *Id.* (emphasis added). Significantly, the Ninth Circuit has held that "'the advent of AEDPA forecloses reversing a state court determination'" regarding a matter that the Supreme Court has left as an "'open question.'" *Alberni v. McDaniel*, 458 F.3d 860, 866 (quoting *Earp v. Ornoski*, 431 F.3d 1158, 1185 (9th Cir. 2005)).[4] Because this question remains open, this Court finds that it does not have the authority

---

[4] Here, this lack of clearly defined Supreme Court precedent is especially pronounced because Leonardos has not been sentenced to death. In *Herrera*, upon which Leonardos relies heavily in arguing that the Supreme Court has sanctioned actual innocence arguments, the Supreme Court assumed for the sake of argument that an actual innocence showing "would render a defendant's execution unconstitutional." 506 U.S. at 392 (majority opinion). Therefore, even assuming that Supreme Court

16

*United States District Court*
For the Northern District of California

1  under 28 U.S.C. § 2254 to disturb the trial court's decision based on Leonardos' actual innocence

2  argument.

### b.   Leonardos Has Not Satisfied the "Extraordinarily High" Burden He Must Meet to Demonstrate His Actual Innocence.

Even assuming for the sake of argument that Leonardos may assert an actual innocence

claim in this non-capital case, Leonardos has failed to meet the "extraordinarily high" burden of

proof that his claim requires.  Leonardos describes the evidence that supports his innocence as

follows:

> [T]he suppressed welfare records [of Brittany's mother] make clear that -- in fact -- there
> was a strong financial motive for the allegations against petitioner.  Moreover, it is now
> clear that in fact [an attorney] *was* consulted [by Brittany's mother] with an eye toward
> filing a civil suit; after the trial ended, this is exactly what happened.... And the record
> now shows that prior to trial, Brittany admitted to at least one friend that nothing
> happened between she and Mr. Leonardos.  Taken together, this new evidence ...
> requires that the writ be granted.

(Petitioner's Memo. of P & A at 27:18-25.)  Therefore, the cornerstones of Leonardos' actual

innocence argument are that: (1) the testimony given by Brittany and Ms. Maxwell was financially

motivated, and therefore neither was credible; and (2) Brittany admitted that Leonardos did nothing

illegal towards her.

### i.   The Impeachment Evidence Offered by Leonardos "Merely Undercuts" the Prosecution's Case.

Ms. Maxwell testified at trial against Leonardos.  Her testimony explained Brittany's

babysitting arrangement with Leonardos.  Ms. Maxwell also described what occurred on or around

November 22, 2002, when she became suspicious that Leonardos had behaved inappropriately

toward Brittany.

Leonardos now seeks to prove his actual innocence by introducing evidence that Ms.

Maxwell had a history of dishonesty, and that she was particularly likely to be dishonest in this

instance because she (and also Brittany, apparently) had a financial incentive to incriminate

_____

precedent endorses actual innocence as a valid ground for a habeas petition, that precedent is clear only
with respect to capital convictions.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Leonardos.  Even assuming *arguendo* that Ms. Maxwell's prior conviction and alleged financial motive were probative of her veracity, this evidence fails to substantiate Leonardos' actual innocence argument.  This evidence "serves only to undercut the evidence presented at trial" and fails to satisfy the exacting burden of proof imposed on petitioners who assert actual innocence claims.  *See Carriger*, 132 F.3d at 477.  Indeed, evidence that merely undercuts the prosecution's case is insufficient even if it "casts a vast shadow of doubt over the reliability of [the] conviction." *Id.*  The Ninth Circuit demonstrated this principle in *Clark v. Lewis*, in which the petitioner alleged that he did not have access to information at trial, and that "with such information he could have impeached [the prosecution's witness] more than he did."  1 F.3d 814, 824 (9th Cir. 1993).  Unpersuaded, the Ninth Circuit reasoned that "latter-day evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of [the witness'] account of petitioner's actions."  *Id.* (quoting *Sawyer v. Whitney*, 505 U.S. 333, 349 (1992)) (alteration original, internal quotation marks omitted).  These holdings demonstrate that the impeachment evidence offered by Leonardos fails to satisfy the remarkably difficult burden that he must meet to demonstrate his actual innocence.

### ii.     The Declaration of Monique Billiet Does Not Prove That Leonardos is Innocent.

Leonardos also relies on the declaration of Monique Billiet -- one of Brittany's friends from Alta Loma Middle School with whom Brittany discussed her relationship with Leonardos -- to support his argument that newly-discovered evidence proves his innocence.  In her declaration, Monique states that the police interviewed her on December 12, 2002, and asked her about Brittany's relationship with Leonardos.  (Petitioner's Ex. D at ¶ 2.)  After this interview, Monique asked Brittany why the police had interviewed her.  Brittany explained to Monique that "she did not know why the police were doing this and it was 'crazy.' [Brittany] also [said] that nothing improper ever happened between her and Mr. Leonardos."  (*Id.* at ¶ 3.)

Monique's declaration does not satisfy the "extraordinarily high" burden that Leonardos must meet in order to demonstrate his actual innocence.  In *Carriger*, Ninth Circuit explained that the petitioner had not met his burden of proving his innocence because he "presented no evidence,

for example, demonstrating he was elsewhere at the time of the murder, nor is there any new and reliable physical evidence, such as DNA, that would preclude *any possibility* of Carriger's guilt." *Carriger*, 132 F.3d at 477 (emphasis added). Like the evidence that the petitioner offered in *Carriger*, Monique's declaration fails to refute any possibility of Leonardos's guilt.

In addition, this Court's review is not limited to the evidence proffered by Leonardos, and instead it "must consider all the evidence, old and new, incriminating and exculpatory." *House*, 547 U.S. at 538 (quoting *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995)) (internal quotation marks omitted). Again, considering the overwhelming evidence of guilt from Leonardos' confession and Danielle Haynie's testimony, this Court finds there is sufficient evidence to sustain Leonardos' conviction.[5]

**E.      The Jury Instructions Did Not Deprive Leonardos of Due Process.**

Next, Leonardos argues that the trial court gave an erroneous jury instruction in violation of his due process rights. Specifically, Leonardos contends that the trial court instructed the jury that it could rely on any one of several alleged acts to convict him under California Penal Code § 647(a) for annoying or molesting a minor, even though many of those acts were actually insufficient to support a conviction. The jury returned a general verdict that did not enumerate the specific acts upon which they premised their conviction. Therefore, Leonardos argues, the verdict may have unconstitutionally rested upon a single act that on its own would not satisfy the elements of the molestation charge.

Regarding the elements of the child molestation charge, the trial court instructed the jury as follows:

---

[5]      Monique's declaration fails to prove that Leonardos is innocent for an additional reason: her statements are not inconsistent with the jury's guilty verdict as to the annoying or molesting a minor charge. California Penal Code § 647.6(a) states an offense for every person who "annoys or molests any child under the age of 18." The words "annoy" and "molest" are "not concerned with the child's state of mind, but rather refer[] to the defendant's objectionable acts that constitute the offense." *People v. Lopez*, 19 Cal. 4th 282, 290 (Cal. Ct. App. 1998) (citing *People v. Carskaddon*, 49 Cal. 2d 423, 426 (Cal. 1957)). Therefore, courts "employ an *objective* test [that is] not dependent on whether the child was in fact irritated or disturbed." *Id.* (citing *People v. Kongs*, 30 Cal. App. 4th 1741, 1750 (Cal. Ct. App. 1994)). Monique's declaration addressed Brittany's *subjective* view towards Leonardos' actions. However, the law is concerned with whether Leonardos' actions were *objectively* annoying. Therefore, Monique's declaration does not demonstrate that Leonardos is innocent because it does not demonstrate that, from an objective perspective, Leonardos did not annoy or molest Brittany.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

   The Defendant is accused in Count 2 of having violated Section 647.6(A) of the Penal Code, a misdemeanor.  Every person who annoys or molests any child under the age of 18 is guilty of a violation of Penal Code Section 647.6(A), a misdemeanor.

   In order to prove this crime, each of the following elements must be shown:  First, a person engaged in acts or conduct directed at a child under the age of 18 which would disturb or irritate a normal person if directed at that person.  And two, the acts or conduct were motivated by an unnatural or abnormal sexual interest in Brittany, the alleged child victim.  It is not necessary that the acts or conduct actually disturb or irritate the child or that the body of the child actually be touched.

(Respondent's Ex. A-6 at 351:22-352:10.)  With respect to unanimity, the trial court instructed as follows:

   Defendant is accused in Count 2 of having committed various crimes in violation of Penal Code Section 647.6(A) of the Penal Code [sic] on or about March 1st, 2002, through November 23rd, 2002.  In order to find the Defendant guilty, it is necessary for the Prosecution to prove beyond a reasonable doubt the commission of a specific act or acts constituting that crime within the period alleged.

   In order to find the Defendant guilty, you must unanimously agree upon the commission of the same specific act or acts constituting the crime within the period alleged.  It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict.

(*Id.* at 352:11-24.)

  **1.**  **Legal Standard For Jury Instructions.**

  In habeas proceedings, federal courts use a two-step analysis to review allegedly erroneous jury instructions.  First, the court "considers whether the error in the challenged instruction, if any, amounted to 'constitutional error.'"  *Morris v. Woodford*, 273 F.3d 826, 833 (9th Cir. 2001) (quoting *Calderon v. Coleman*, 545 U.S. 141, 146 (1998)).  If the instruction did not contain a constitutional error, then the inquiry ends and the petitioner's writ is properly denied.  *See id.*  If the federal court finds that the instruction did contain a constitutional error, "the court then considers whether the error was harmless."  *Id.* (citing *Calderon*, 545 U.S. at 145).  To determine whether an erroneous jury instruction violated a defendant's due process rights, "the only question [for the reviewing federal court] is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  *Estelle v. McGuire*, 502 U.S. 62, 71-71 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)) (internal quotation marks omitted).  When it performs this analysis, the reviewing court must be cognizant of "the well established proposition that a single

United States District Court
For the Northern District of California

instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp*, 414 U.S. at 146-47 (citing *Boyd v. United States*, 271 U.S. 104, 107 (1926)).

**2.      The Unanimity Instruction Did Not Violate Leonardos' Due Process Rights.**

**a.      There is No Reasonable Likelihood that the Jury Applied the Unanimity Instruction in an Unconstitutional Manner.**

Leonardos' claim hinges on whether the instruction that the trial court gave to the jury was unconstitutionally ambiguous. *See Cupp*, 414 U.S. at 147. Unless there is an appreciable likelihood that the jury interpreted the instruction in the unconstitutional manner that Leonardos alleges it did, Leonardos was not denied due process. *See, e.g.*, *Estelle*, 502 U.S. at 72 & n.4; *Boyde*, 494 U.S. at 380. Here, the California Court of Appeal has reviewed Leonardos' argument. It concluded that Leonardos' argument "misconstrue[d] the instruction that was given" because the "instruction simply did not require that the jury unanimously agree that [Leonardos] violated section 647.6(a) by committing only one of the many acts appellant was accused of committing." (Respondent's Ex. B-3 at 9.) Viewed in light of the state's theory of the case, the evidence it presented, and the instructions themselves, the Court finds that the California Court of Appeal correctly concluded that the instruction was unambiguous.

Contrary to Leonardos' assertions, the prosecution made clear in its closing statement that it was not asking the jury to convict based on one act, but was instead proceeding on a course of conduct theory. The prosecution stated that: (1) the annoying or molesting charge was "for all the conduct that led up to Saturday night"; (2) the count pertains to "all that stuff" (referring to numerous acts of miconduct); (3) the charge applies to "acts" directed at a child under 18; and (4) the victim need not actually be touched or irritated during the "acts of conduct." (Respondent's Ex. A-6 at 297:7-18, 301:12-21.) Furthermore, the prosecution specifically addressed the unanimity requirement when it told the jury that "you've got to unanimously agree on which acts [Leonardos]

1    did before you can convict him" of the molestation charge.[6]  (*Id.* at 302:23-25.)  Provided with this

2    explanation, there was not a "reasonable likelihood" that the jury applied the instructions in an

3    unconstitutional manner.

4         Accordingly, the jurors knew that the prosecution relied on a course of conduct theory, and

5    also knew that they had to agree unanimously on each of the specific acts that constituted

6    Leonardos' course of conduct.  When the record is considered as a whole, it is clear that the jury

7    understood that they could not convict Leonardos unless they found that he had engaged in a course

8    of conduct that satisfied each element of California Penal Code § 647.6(a).  Therefore, the alleged

9    ambiguity did not cause the jury to believe that they could convict Leonardos based on a single act.

10   Because it was not reasonably likely that the jury based its conviction on unconstitutional grounds, it

11   follows that the jury instructions did not "so infect[] the entire trial that the resulting conviction

12   violates due process."  *Estelle*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147).

13        **b.    Even if the Jury Instruction was Improper, It Did Not Prejudice**
           **Leonardos and Was Harmless.**

14

15        Even assuming that the unanimity instruction regarding the charge against Leonardos was a

16   constitutional error, this error could not have prejudiced Leonardos, and was thus harmless.  An

17   instructional error does not necessarily amount to a due process violation because "various forms of

18   instructional error are ... subject to harmless error review."  *Hedgpeth v. Pulido*, 129 S. Ct. 530, 531-

19   32 (2008) (per curiam).

20        As the California Court of Appeal correctly held, any error in the trial court's unanimity

21   instruction was harmless and, if anything, benefitted Leonardos.  (*See* Respondent's Ex. B-3 at 10.)

22   The instruction that the trial court read to the jury lent itself to two possible interpretations regarding

23   the government's burden to prove that Leonardos engaged in a course of conduct that violated

24   California Penal Code § 647.6(a).  The first is that the jurors had to agree unanimously that

25   Leonardos committed several acts that together satisfied the elements of the charge, but that they did

---

27       [6]  The Court notes that these statements from the prosecution's closing argument are relevant
28   because the "[jury instruction] 'may not be judged in artificial isolation,' but must be considered in the
     context of the instructions as a whole and the trial record."  *Estelle*, 502 U.S. at 72 (quoting *Cupp*, 414
     U.S. at 147).

United States District Court
For the Northern District of California

1   not have to agree unanimously on what those particular acts were.  The second is that the jurors had

2   to agree unanimously that Leonardos engaged in a course of conduct that satisfied the elements of

3   the charge, and also agree unanimously on each particular act that he committed within that course

4   of conduct.  The California Court of Appeal explained in *People v. Avina* that the burden of proof

5   reflected in the first interpretation is all that California law requires.  14 Cal. App. 4th 1303, 1309

6   (1993).  The *Avina* Court stated that "if the case falls within the continuous course of conduct

7   exception," then it is unnecessary to instruct the jury on the need for unanimous agreement on the

8   distinct acts supporting the charge.  *Id.*  It also noted that annoying or molesting a child is among

9   those charges that are amenable to a course of conduct theory.  *Id.* (citing *People v. Moore*, 185 Cal.

10   App. 3d 1005, 1015 (1986)).

11          Therefore, the unanimity instruction itself was unnecessary with respect to this charge.

12   Furthermore, if the jury understood the unanimity instruction to require unanimous agreement on the

13   individual acts that comprised the course of conduct, that ambiguity worked to Leonardos'

14   advantage.  Because Leonardos could not possibly have suffered prejudice as a result of the jury

15   instruction in question, the Court finds that his claim of a due process violation based on the jury

16   instruction is meritless.

### CERTIFICATE OF APPEALABILITY

18          The federal rules governing habeas cases have been amended to require a district court that

19   denies a habeas petition to grant or deny a certificate of appealability in the ruling.  *See* Rule 11(a),

20   Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).  A petitioner

21   may not appeal a final order in a federal habeas corpus proceeding without first obtaining a

22   certificate of appealability (formerly known as a certificate of probable cause to appeal).  *See* 28

23   U.S.C. § 2253(c); Fed. R. App. P. 22(b).

24          A judge shall grant a certificate of appealability only if "the applicant has made a substantial

25   showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The certificate must

26   indicate which issues satisfy this standard.  *See id.* § 2253(c)(3).  "Where a district court has rejected

27   the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:

28   the petitioner must demonstrate that reasonable jurists would find the district court's assessment of

**United States District Court**
For the Northern District of California

the constitutional claims debatable or wrong. *Slack v. McDaniel*, 120 S. Ct. 1595, 1604 (2000). For the reasons set out in the discussion on the merits, above, jurists of reason would not find the result debatable. A certificate of appealability is DENIED.

### CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The Clerk shall enter a separate judgment and close the file.

**IT IS SO ORDERED.**

Dated: October 12, 2010

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE